UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S.A.R.L. GALERIE ENRICO NAVARRA
and ENRICO NAVARRA,

                                    Plaintiffs,

                    v.

MARLBOROUGH GALLERY INC.,
PHILIPPE KOUTOUZIS, and PIERRE
LEVAI,

                                    Defendants.

10 Civ. 7547 (BSJ) (RLE)

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT[1]

S.A.R.L. Galerie Enrico Navarra (the "Navarra Gallery") and Enrico Navarra

("Mr. Navarra") (collectively "Plaintiffs"), by their attorneys, Foley & Lardner LLP, for their

amended complaint against Marlborough Gallery Inc. ("Marlborough"), Philippe Koutouzis

("Koutouzis") and Pierre Levai ("Levai," and collectively with the other defendants

"Defendants"), allege as follows:

### Parties

1.   S.A.R.L. Galerie Enrico Navarra is a corporation organized under the laws of France

with its principal place of business at 75 rue du Faubourg Saint-Honoré, Paris, France.

2.   Enrico Navarra is an individual residing and domiciled in Paris, France.

---

[1] Pursuant to the Order dated April 2, 2012, Docket # 29, the Court denied leave to amend the complaint to assert certain causes of action asserted in the Proposed Amended Complaint attached (as Docket # 24-3) to Plaintiffs' Motion For Leave to Amend Complaint, Leave to Add Additional Defendants, Relief From The Judgment And to Alter or Amend The Judgment. Accordingly, the Amended Complaint filed herewith, consistent with the Order, omits those causes of action and factual allegations related thereto. However, Plaintiffs do not intend by that omission to waive those causes of action, nor the factual allegations relating thereto, nor their right, upon final judgment in this action, to appeal the relevant portions of the Order, which causes of action, factual allegations and appeal rights are expressly reserved hereby.

4810-4019-5085

3.   Marlborough Gallery Inc. is a corporation organized under the laws of New York State with its principal place of business at 40 West 57th Street, New York, New York 10019.

4.   Philippe Koutouzis, during the events detailed herein, was Marlborough's "director for Asia." His last known residence and domicile is at 1657 Route 9d, Cold Spring, New York, 10516. Each act by Koutouzis alleged herein was done as Marlborough's agent and for Marlborough's benefit.

5.   Pierre Levai is president of Marlborough. On information and belief, his residence and domicile is at 382 Lafayette Street, Apt. 5, New York, New York 10003. Upon information and belief, each of the acts alleged herein to have been done by Marlborough or on its behalf was approved and ratified by Levai.

**Personal Jurisdiction**

6.   This Court has personal jurisdiction over Defendants because, *inter alia*: (a) Marlborough is a corporation organized under the laws of New York State; (b) Marlborough's principal place of business is at 40 West 57th Street, New York, New York 10019; (c) in a passport issued on January 20, 2010, Koutouzis listed his residence and domicile as 1657 Route 9d, Cold Spring, New York, 10516; (d) Koutouzis owns a home at 1657 Route 9d, Cold Spring, New York, 10516; (e) Koutouzis has a New York cell phone number; (f) Koutouzis claims currently to maintain gallery space for his company, Feast Projects, in New York City; (g) Koutouzis has been employed by Marlborough since 2001, and contracts governing that employment relationship were entered into in 2001, 2003, 2005, 2007, and 2011; (h) Koutouzis has entered into contracts in which he consents to exclusive jurisdiction in the courts of New York, New York; (i) Koutouzis' numerous contracts with Marlborough contemplated performance at least in part in New York; (j) Koutouzis has and has had continuous and

4810-4019-5085

systematic contacts with New York; (k) Koutouzis transacts business within New York; (l) the conduct by Koutouzis complained of herein arises, in part, from his business transactions within New York; (m) the conduct by Koutouzis complained of herein includes torts that occurred in part in New York; (n) the conduct by Koutouzis complained of herein includes torts that have caused injury in New York; (o) Koutouzis continues to receive mail at his New York residence; and (p) Pierre Levai is a domiciliary and resident of New York.

### Subject Matter Jurisdiction

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a).

### Venue

8.  Venue is proper in this District pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1391.

### Factual Background of Claims

9.  Established in 1988 by the art dealer Enrico Navarra, the Navarra Gallery is a Paris-based dealer in high-end works of fine art. For two decades before that, Mr. Navarra operated a private high-end art dealing business that he grew to become one of the most successful worldwide. Over this period, and until the events described further herein, the Navarra Gallery and Mr. Navarra himself both bought and sold high-end art worldwide – including, frequently, in the United States and to United States citizens. Mr. Navarra, from 1989 through April 2011, maintained gallery space in New York, including space at 980 Madison Avenue, which he leased and renovated at great cost in 2008, only to be forced to abandon that space as a result of the acts complained of herein. During all that time, Mr. Navarra had a New York-issued resale number, which he still maintains.

10. The market for high-end works of art, including the ceramics at the heart of this action, is small, specialized and global. It encompasses a small group of buyers and sellers located all over the world, including in the largest market for high-end art, the United States. In

4810-4019-5085

this market, aesthetic judgments are not the only consideration driving purchasing decisions. The value, and even salability, of a work of art is also determined by such matters as supply, provenance, authenticity, perceptions regarding the extent of an artist's involvement in the production of the work, and where a particular work falls in relation to the rest of an artist's oeuvre. Accordingly, information about such matters is highly material to purchasing and pricing decisions within this market.

11. Moreover, in light of the small, specialized and global nature of this market, information about such matters, wherever originally published, is disseminated worldwide and can reliably be expected to find its way to anyone who might be interested in purchasing the relevant work.

12. The fact that the market for high-end art is small, specialized and global also means that an art dealer's reputation for integrity and trustworthiness is vital to his or her ability to operate successfully in this market. Artists', sellers' and buyers' willingness to do business with a dealer is increased by a positive reputation in this regard, and can be eliminated entirely by any intimation that calls that reputation into question.

13. Over the decades preceding the wrongdoing alleged herein, Plaintiffs spent tens of millions of dollars and countless hours creating a successful brand as trusted and prestigious dealers within this small, specialized, global market. Through tireless networking and publicity, they developed relationships with virtually all the major participants in this market all over the world; they published 10 major books and more than 60 catalogues on various art-related subjects; they frequently participated in auctions, gallery exhibitions, art fairs and art-related events all over the world, including Beijing, Shanghai, Taipei, Hong Kong, Tokyo, Bali, Buenos Aires, San Paulo, Reciffe, Cotonou, Abu Dhabi, Venice, Rome, Naples, Milan, Monaco,

4810-4019-5085

Brussels, Vancouver, Luxembourg, St. Tropez, Paris, and New York; they organized and produced major shows promoting Jean-Michel Basquiat and Keith Haring, among American artists, Marc Chagall, Bernar Venet, Arman, Cesar, Shan Sa, among European artists, were pioneers in promoting major contemporary Chinese artists such as Zhang Xiaogang, Yue Minjun, and Wang Guangyi, and were one of the first fine art dealers to promote architects and designers such as Jean Prouvé, Tadao Ando, and Ron Arad; and they spent vast amounts on gallery space in France, Asia and the United States. All of these expenditures were designed to burnish their all-important reputations as trusted and prestigious dealers of high-end art throughout the world, as well as increase the value of the art in which they had invested.

14. The market for high-end works of art also contains submarkets for the works of art by individual artists. Indeed, it is well-recognized that the work of a single well-known artist can constitute its own defined submarket. That is because, unlike such products as soda or snacks, participants in the high-end art market are animated primarily by highly subjective tastes and motivations. For example, in holding that Jackson Pollock paintings can constitute an antitrust market unto itself, Judge Leisure, in <u>Vitale</u> v. <u>Marlborough Gallery</u>, No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994), noted that "as any major art purchase may be motivated by highly subjective tastes, one cannot assume that a Rothko or a Franz Kline is interchangeable with a Pollock, as a salted peanut may be interchangeable with a salted corn chip … In the esoteric world of art collecting, a Rothko painting would by no means satisfy the same artistic taste as would a Pollock painting." <u>Id</u>. at *4 (internal citation omitted). By the same token, it is well-recognized that price differences among the works of a particular artist (even when those amount to many multiples) do not prevent those works from occupying the same market. In the case of Jackson Pollock paintings, for example, prices of individual works can vary by millions.

4810-4019-5085

Yet that was no barrier to the existence of a single market.  The reason, again, is that, unlike buyers of soda or snacks, art collectors are primarily motivated by a subjective taste for and an interest in the work of a particular artist.  Art dealers and auction houses certainly know this. That is why they often market works by a single artist together, and to the same group of customers, regardless of sometimes extreme price differences in the works on offer. Marlborough does that often.

15.  Within those submarkets for an individual artist's work, there are also further submarkets for specific aspects of that artist's oeuvre.  This is particularly so in the case of ceramics work, which, because of the fragility of the artwork, has a much smaller market, with many fewer potential customers, than work in other media.  Within that niche, however, the dynamics of the market are exactly the same: many collectors focus on particular artists, collect work at varying price points, and respond to increases in prices often by switching to less expensive ceramics works by the same artist.

16.  One such submarket is the market for the sale of ceramics work by the Paris-based Chinese artist Chu Teh-Chun (hereinafter "CTC"). Born in China in 1920, CTC emigrated to Paris in the mid-1950s and obtained French nationality in 1980.

17.  That a distinct, global, recognized submarket exists for the sale of CTC's ceramic work is confirmed by the following facts: (a) CTC's ceramic works are often advertised for sale, whether privately or at auction, by specific reference to the name Chu Teh-Chun, rather than by a generic reference to "art," "contemporary art," "Asian art," or the like, and by specific reference to the medium employed, rather than a generic reference to "artwork" or the like; (b) showings and exhibitions of CTC's ceramic work often feature multiple works by CTC, to the exclusion of all other modern, contemporary or Asian artists, and to the exclusion of work by CTC in other

4810-4019-5085

media; (c) prospective buyers and sellers estimate the value of CTC's work primarily by reference to the supply and sales prices of other CTC work, not by reference to the supply and sales prices of work by other artists, and primarily by reference to the supply and sales prices of other CTC ceramic work, not by reference to the supply and sales prices of CTC's work in other media; and (d) there is distinct group of collectors of CTC's ceramics work who, because of their specific taste for and interest in CTC's ceramics work, would not view such work to be interchangeable with ceramics work by other artists or with work by CTC in other media, indicating low cross-elasticity of demand.

18. Until the acts complained of herein, Plaintiffs were participants in the market for high-end art generally, the submarket for CTC's work in particular, and even more particularly the further submarket for CTC's ceramic work.

19. Plaintiffs' involvement in the submarket for CTC's work generally began in 1997, when Plaintiffs organized a show of CTC's paintings in Paris. Over the succeeding years, through 2005, Plaintiffs showed CTC's paintings continually, including shows in the South of France and Bali.

20. Plaintiffs supplemented those successful shows with the publication of two comprehensive books on CTC's work, including, in 2000, the first important monograph of CTC's work, with a text by Pierre Restany, one of the most important art critics of the 20th century. This book was published in both French and English in order to reach the international market.

21. Plaintiffs' efforts and expenditures in this regard were part of a much larger and expensive effort by Plaintiffs to tap the growing market for Asian art, both in Asia and throughout the world, and the growing market in Asia for Western art. To that end, in addition

4810-4019-5085

to the foregoing, Plaintiffs spent many millions of dollars on marketing, entertainment, exhibitions and art fairs in Asia and around the world all directed at these growing markets.

22. The strategy proved successful, both for CTC, who began to achieve the commercial and critical success that had long alluded him, and for Plaintiffs.

23. For most of this period, CTC, who had produced only a few ceramics works, was primarily known for his paintings.

24. That changed, however, in 2002, when CTC began to work with La Tuilerie, a ceramics manufactory in Treigny, France. The resulting ceramics were subsequently exhibited to acclaim at the Bouquinerie de l'Institut in Paris.

25. Following the success of that project, CTC and a representative of La Tuilerie, Francis Delille ("Delille"), approached Plaintiffs with a request to finance the production of a new series of CTC ceramics. Recognizing the commercial potential in this new aspect of CTC's oeuvre, Plaintiffs readily agreed to the proposal.

26. In June of 2003, CTC, Delille (on behalf of La Tuilerie) and the Navarra Gallery signed a Production Agreement (the "Production Agreement") under which, together with subsequent amendments: (a) CTC agreed to create 24 original plates, each covered with an original painting by CTC; (b) each of those 24 original plates, following CTC's final approval and execution of *bons-à-tirer* on the back of the plates, would then be produced in multiples by La Tuilerie, working with CTC, in editions of 40 plus eight artist's proofs; (c) within each edition, the Navarra Gallery would receive upon completion 32 of the plates plus two artist's proofs, La Tuilerie would receive eight of the plates plus two artist's proofs, and CTC would receive four artist's proofs; (d) the Navarra Gallery agreed to publish a catalogue documenting the production of the ceramics (the "Navarra-Commissioned Ceramics"); (e) the Navarra Gallery

4810-4019-5085

agreed to pay for all of the above with an advance on ultimate sales royalties equal to 14% of the agreed upon minimum sales prices of the ceramics (1,300 Euros for each round plate, 1,600 Euros for each square plate), to be paid as La Tuilerie delivered the finished plates in batches of 10 per series per year, for a total of 155,904 Euros, with additional royalties paid by either Delille or Navarra Gallery in the event either ultimately sold the Navarra-Commissioned Ceramics for more than the agreed upon minimum sale price listed in the Production Agreement; and (f) CTC agreed not to commence any additional editions of ceramics during 2004, and no more than 20 editions, with a limit of 20 ceramics in each edition, during 2005 and 2006, with the narrow exception that CTC was permitted to produce during this period unique ceramics, not in editions, fabricated entirely by his hand.

27. Plaintiffs planned to sell the Navarra-Commissioned Ceramics around the world, and in particular in the United States, where Mr. Navarra planned to sell the works out of his New York gallery space.

28. Shortly after signing the Production Agreement, each of the parties began to perform its designated obligations.

29. Although the Production Agreement envisioned a brief experimentation and testing period prior to CTC's completion of finished original painted ceramics and the issuance of *bons-à-tirer*, CTC quickly fell behind schedule. Indeed, he and Delille ended up working together over a two year period and 111 meetings to test colors and materials, perfect the "cooking" process, and create the relevant ceramics. After each step in this process, CTC would inspect the results and make changes as desired.

30. Ultimately, CTC selected 24 final plates for production in multiples. He selected six plates that were based on designs previously used in the Bouquinerie de l'Institut show, 12 from

4810-4019-5085

among the 25 original painted plates he created over the two year period (2003 and 2004) described above, and six that, at CTC's direction, were created from gouache and acrylic paintings he made specifically for the project on paper the exact size of the plates.

31. A first multiple of each of the 24 plates was then produced under the control of CTC so that he could verify that the results of the production process were satisfactory to him. Those exemplars were then submitted to CTC for his approval. At that point, CTC inspected each of the exemplars and, signaling his final satisfaction and approval of the production of the 24 plate editions, CTC signed *bons-à-tirer* for each of the 24 plates. By custom and usage, the signing of a *bon-à-tirer* is the artist's imprimatur on works printed in multiples signaling that the "experimentation and creation process" is over and that final completed works can now be produced and marketed to the public as finished works by the artist.

32. CTC signed the relevant *bons-à-tirer* on each of the 24 plate designs during 2003 and 2004 as he completed the experimentation and creation process involved in each one. He signed the last one in December of 2004, over one year behind schedule. This delay operated to push back by one year all the dates in the Production Agreement, including the exclusivity period. The *bons-à-tirer* remained at La Tuilerie to be used as a reference for each multiple.

33. Following CTC's signature on each *bon-à-tirer*, La Tuilerie began the time-consuming and expensive production process, producing and delivering each year to the Navarra Gallery and CTC, and keeping for itself, the designated number of plates.

34. In accordance with the Production Agreement, CTC received his allotment of plates – the original base model plus four artist's proofs of each edition – and invoiced the Navarra Gallery for his royalty advances. Pursuant to such invoices, the Navarra Gallery paid CTC 48,720 Euros in 2005 and 48,720 Euros in 2006. CTC cashed the checks.

4810-4019-5085

35. During this period, Navarra-Commissioned Ceramics were sold and exhibited extensively with CTC's knowledge and approval. In July 2004, Delille sold a series of his Navarra-Commissioned Ceramics to a friend of one of CTC's children. This was done with CTC's knowledge and approval. In October 2004, Navarra-Commissioned Ceramics were shown at Art Paris. CTC's wife attended the opening. From March to June, 2005, Navarra-Commissioned Ceramics were exhibited at Muel-Saragosse, a museum in Saragosse, Spain. CTC received 40 copies of the catalogue for this exhibition. From June 9 to September 2, 2006, CTC himself organized an exhibit of Navarra-Commissioned Ceramics at the Bastien Gallery, in Brussels. From October 5 to November 25, 2006, Navarra-Commissioned Ceramics were shown at Galerie Minsky in Paris. CTC and his wife were notified of the exhibit and invited to the dinner after the opening. The gallery director even conferred directly with CTC on sales prices for the works.

36. During this period, CTC also participated in the preparation of two publications related to the Navarra-Commissioned Ceramics. In September 2006, CTC asked Joachim Vital ("Vital"), at Éditions de La Différence, a French publisher, to give Jean-Paul Desroches ("Desroches"), a French curator, a choice of editing one of two planned books – one on CTC's watercolors and one on CTC's ceramics, including the Navarra-Commissioned Ceramics. Desroches chose to work on the ceramics book. Further, in December 2006, CTC sat for a photo session for use in a catalogue Plaintiffs were preparing on the Navarra-Commissioned Ceramics. The resulting photos show CTC painting the Navarra-Commissioned Ceramics.

37. Over this period, the value of Navarra-Commissioned Ceramics rapidly and steadily increased. For example, on November 19, 2006, two Navarra-Commissioned Ceramics were resold by a customer of Delille at Perrin, Royere, Lajeunesse auction house for 2,500 and 3,000

4810-4019-5085

Euros.  The catalogue for the auction indicates that the ceramics are "Navarra editions."  Only one month later, on December 12, 2006, a Navarra-Commissioned Ceramic sold for 5,000 Euros at Artcurial auction house in Paris.  Again, the catalogue makes clear that the ceramic was a "Navarra edition."

38. In short, during this time frame, the Navarra-Commissioned Ceramics were a great artistic and commercial success.

39. Then Defendants entered the picture.

40. Upon information and belief, Defendants began their relationship with CTC in 2005 in connection with a plan to replicate the success Plaintiffs had had in developing an art dealing business in Asia and in selling Asian art to Western collectors.

41. Defendants were well-aware of Plaintiffs' success in this regard and had, for a number years, been copying Plaintiffs' strategy, including by staging similar exhibitions in similar locations.

42. Consistent with the foregoing, and seeing the success of Plaintiffs' CTC ceramics project, Defendants, almost from the beginning of their involvement with CTC, sought to convince CTC to do a ceramics edition for them.  Indeed, by late November and early December 2006, Koutouzis and Levai were emailing each other frequently about the Navarra-Commissioned Ceramics, exchanging pictures of them, discussing the details of the series and monitoring the frequency and prices of their sales at auction.

43. As Defendants recognized, however, the Navarra-Commissioned Ceramics posed both a commercial and legal impediment to Defendants' desire to do a CTC ceramics edition.

44. The commercial impediment posed by the Navarra-Commissioned Ceramics arose from the fact that the Navarra-Commissioned Ceramics – 1,152 individual plates – substantially

4810-4019-5085

reduced the price at which Marlborough could sell its own CTC ceramics edition. It is a fact of the art market generally, understood by Defendants, that a large number of similar works by an artist on the high-end art market at the same time depresses prices. Even though the market for such works is global, it is too small to absorb the supply. This is particularly so for ceramics work, and even more so for ceramics work by CTC, which are both niche markets with many fewer potential buyers than the market for less fragile works such as paintings and photographs. Over 1,100 individual ceramics by CTC created a saturated market and virtually guaranteed the unprofitability of any investment by Defendants in an additional CTC ceramics edition.

45. The legal impediment arose from the Production Agreement, and specifically its exclusivity provisions, which limited CTC's ability to produce additional editions of ceramics in sufficient numbers to make the project commercially profitable – a problem exacerbated by the market saturation described above. Moreover, CTC, at nearly 87 years old and in poor health, was at this point physically incapable of and unwilling to produce the one-off ceramics fabricated entirely by his hand that the Production Agreement would have allowed CTC to produce. Koutouzis was well-aware of those limitations. In fact, Koutouzis was advised several times of the existence of the Production Agreement and had sought a number of times to see a copy of it.

46. Confronted with these impediments, Defendants, rather than adjusting their commercial ambitions to the practical realities of the market and the legal limitations contained in the Production Agreement, instead embarked on a wrongful, malicious, covert and sustained effort to, in essence, erase them from existence.

47. In doing so, Defendants did not act alone.

4810-4019-5085

48. Instead, in taking the actions that followed, Defendants were able to call upon and hide their wrongdoing behind a network of agents willing, often in exchange for money or financial advantage, to act on their behalf and for their benefit.

49. First, there was CTC's son, Yvon Chu ("Yvon"). By 2006, CTC was nearly 87 years old and in poor health, and Yvon had seized control of his business affairs. Yvon, inexperienced in business and the art world, was in turn acting at the direction of Defendants, and in particular Koutouzis.

50. Indeed, over the course of the actions and events described herein, Yvon ultimately explicitly assumed the role of a Marlborough agent, including by signing contracts on Marlborough's behalf to hide Marlborough's involvement in wrongdoing, and working on behalf of Defendants to market and sell Defendants' CTC ceramics edition all over the world.

51. Further, Yvon and his siblings ultimately would receive a substantial portion of Defendants' CTC ceramics edition, and an even larger interest in the future commercialization by Defendants of that ceramics edition. Accordingly, he had a financial motive to assist Defendants in the wrongdoing alleged herein.

52. Second, there was Desroches. Desroches, a frequent collaborator of Defendants, and a close friend of Koutouzis, was hired and paid by Defendants to oversee and influence CTC in connection with Defendants' efforts to have CTC produce a ceramics edition and then to help Defendants market and sell that ceramics edition all over the world.

53. As Curator in Chief of the state-owned and operated Musée National des Arts Asiatiques Guimet in Paris ("Musée Guimet"), Desroches was at all relevant times a French government employee and therefore could not legally accept payment for work done on behalf of a purely commercial enterprise such as Marlborough. Because of that fact, Defendants arranged

4810-4019-5085

to hide their remuneration of Desroches by paying members of Desroches' family, rather than Desroches himself, for the work he would do on Defendants' behalf.

54. Desroches, like Yvon, gradually, over the course of the campaign described below, shed any pretence of being an impartial state-employed museum curator, and instead acted openly as Defendants' agent.  For example, Koutouzis designated Desroches as Marlborough's agent in attempting to arrange a possible exhibit of Defendants' CTC ceramics edition at a museum in Germany.  Desroches even designed the physical layout of Defendants' CTC ceramics in Marlborough's booth at the Asian Pacific Contemporary Art Fair in Shanghai in September 2008.

55. Moreover, in various advertisements for Defendants' CTC ceramics edition, Desroches has knowingly made false statements about both Defendants' CTC ceramics edition and the Navarra-Commissioned Ceramics, in an effort to increase the value of the former and eliminate the latter from the market.

56. Further, Desroches, using his position at Musée Guimet, arranged for Marlborough to use the museum for an exhibit of Defendants' CTC ceramics edition – a purely commercial enterprise for the sole benefit of Marlborough – and then assisted in attempting to hide the commercial nature of the exhibit by arranging for Yvon to sign the exhibition contract on behalf of CTC's family, which the contract falsely describes as the "owners of the pieces" (in fact Marlborough owned the overwhelming majority of the pieces exhibited), and on behalf of an unnamed gallery (Marlborough) where, the contract claims falsely, the ceramics were merely "on deposit."

57. With respect to both Desroches and Yvon, there is still an additional fact demonstrating that, at all relevant times, they were acting as a single unit with and on behalf of

4810-4019-5085

Defendants.   From as early as November 2007, an entity calling itself Atelier Chu Teh-Chun ("Atelier CTC") has exercised complete control over every aspect of CTC's business and artistic affairs, including by arrogating to itself entirely the role of speaking and acting in CTC's name. Indeed, in all of the wrongdoing described herein, CTC himself never once appeared in public, in court or in correspondence to act or speak on his own behalf.  It has been announced publicly, by Desroches and Koutouzis, that Atelier CTC, which was not officially registered in France until April 18, 2009, is controlled by Koutouzis, Desroches, Yvon and CTC's wife.

58. Third, there was William Bourdon ("Bourdon").  Upon information and belief, Bourdon, a French attorney, came to be friends with Koutouzis in 1998 when Bourdon's firm represented Koutouzis in connection with a copyright matter related to the Chinese artist T'Ang Haywen, who died in 1991, whose estate Marlborough claims to represent, and with respect to which Koutouzis and Desroches have been working together since 1994.  In taking the actions alleged herein, Bourdon, although ostensibly acting on behalf of CTC, in fact was taking direction not from CTC but from Koutouzis and Yvon.  For example, emails in connection with Bourdon's supposed representation of CTC were exchanged only among Bourdon, Yvon and Koutouzis.  Further, Bourdon has answered letters Plaintiffs sent to Marlborough and Koutouzis alone and has informed Plaintiffs that he has recently been retained as Koutouzis' personal lawyer.  Finally, Bourdon has been coordinating with Defendants in the defense of this action. Indeed, Bourdon has resisted discovery requests in France by noting that Marlborough has already produced certain documents to Plaintiffs in this action, a fact Bourdon could not possibly have known from the public record.

59. Fourth, there was David Caméo ("Caméo"), the director of Manufacture Nationale de Sèvres ("Sèvres"), the state-owned foundry where Defendants planned to have their CTC

4810-4019-5085

ceramics edition produced.  As shown herein, Caméo, a close friend of Levai, worked with

Defendants to help mislead the public about the characteristics of Defendants' CTC ceramics

edition – in the process violating Sèvres' own rules and practices regarding how its ceramics

editions are to be described.  For example, although Caméo has participated in Defendants' effort

to mislead the public by pretending that Defendants' CTC ceramics edition is not an "edition" of

ceramics (which would require that they be numbered by reference to the size of the edition, for

example "1/54," "2/54," etc.), in fact Sèvres has always insisted that identical projects done with

other artists be identified clearly as part of editions and numbered by reference to the edition

size.  Moreover, Caméo and Sèvres had incentive to aid Defendants in this critical

misrepresentation both out of loyalty to Levai and because Sèvres itself received a number of the

Marlborough CTC ceramics as payment.  Accordingly, Defendants' misleading descriptions of

the ceramics project enhanced the value of Sèvres' CTC ceramics holdings.

60. Finally, there was Sylvie Messinger ("Messinger").  Like Desroches and Caméo,

Messinger was an employee of the French government, in her case the head of the multi-media

section at the Château Versailles.  Also like Desroches, Defendants hid their payments to her.

Those payments were for her services in arranging to have Éditions de La Martinière, a

prestigious French publisher, publish and distribute a supposed "book" by Desroches on

Defendants' CTC ceramics edition, which was in actuality little more than a sales brochure for

which Defendants provided all the text.

61. With these agents in place, Koutouzis and Desroches, who both attended an earlier

meeting with Vital and CTC's family in November 2006 regarding the planned book on CTC

ceramics to be published by La Différence and edited by Desroches, first prevailed on CTC's

4810-4019-5085

family to abandon that project in favor of the supposed "book" on Defendants' CTC ceramics. CTC later told Vital that it was Marlborough that urged him to cancel the La Différence book.

62. With the La Différence book out of the way, Koutouzis then obtained a copy of the Production Agreement and examined it to see if there was a basis to have it voided. As he later recounted to Levai in an email of February 22, 2007:

> In 2003, Chu had signed a ceramics publishing contract with Navarra. He had talked to me about it several times and, one thing led to another, he showed me the contract. In reading it, I saw that there was a flaw and I talked of Chu with William Bourdon, a lawyer friend at ADAGP. Indeed, William saw that Navarra had failed to meet its contract obligations and CHU should recover half the rights if not all in the ceramics production.
> The contract was for 24 models to be published in 10 copies each for 4 years > 24x10x4 – 960 ceramics. Navarra had produced few. One piece of ceramics was sold two days ago for 3500 Euros.
>
> Chu wants to recover the ceramic that we displayed last year in Beijing. We will talk about it in connection with the Sevres agreement.

63. As this email, and other evidence like it, make clear, it was Koutouzis – not CTC – who considered there to be a "flaw" in the Production Agreement; it was Koutouzis – not CTC – who contacted Bourdon (without apparently first consulting CTC); it was Koutouzis – not CTC – who hoped to get back "half the rights if not all in the ceramics production," thereby freeing CTC to do Marlborough's otherwise-prohibited ceramics edition and clearing the market of ceramics that would otherwise have competed with that edition; and it was Koutouzis and Bourdon – not CTC – that conceived the strategy subsequently deployed in CTC's name.

64. Indeed, further confirming that CTC himself was not behind the subsequent efforts to void the Production Agreement, CTC, by this time, had cashed royalty checks from the Navarra Gallery and Delille of 97,440 Euros and 38,976 Euros, respectively, posed for photographs with the Navarra-Commissioned Ceramics to be used in an exhibition catalogue Plaintiffs were

18

preparing, and even helped to determine pricing of the works with gallery directors.  Moreover, even after the actions described below were taken in CTC's name, CTC himself behaved as if no such "flaw" in the Production Agreement existed – for example, by continuing to cash in 2007 additional royalty checks from the Navarra Gallery totaling 58,464 Euros.

65. Nor was Koutouzis correct that there was a "flaw." As a subsequent February 19, 2007 cease and desist letter to Plaintiffs indicates, the supposed "flaw" Koutouzis identified was an alleged failure to obtain the required *bons-à-tirer* on each of the 24 series of the Navarra-Commissioned Ceramics, a failure to pay royalties upon the sale of ceramics, and a delay in production.  None of these accusations was true.

66. First, CTC did in fact sign all the required *bons-à-tirer*.  Each was on file at La Tuilerie.  Indeed, the court-appointed expert in the subsequent French court case issued a preliminary report in July of 2009 and a final report on October 2, 2009, finding that it is incontestable that all the required *bons-à-tirer* had been signed.  Moreover, Yvon, who held himself out as CTC's representative during the expert's investigation, did not in fact contest that all the required *bons-à-tirer* had been signed by his father.  Further, Delille, as early as July 2007, informed Plaintiffs that CTC himself confirmed to Delille that all *bons-à-tirer* had been signed.

67. Second, the lack of royalty payments upon the sale of ceramics stemmed from the fact that Plaintiffs, unlike Delille, in fact had not sold any Navarra-Commissioned Ceramics.  And Delille, for his part, had promptly paid CTC all royalties owed.

68. Third, the supposed delays in delivering additional series of ceramics was wholly due to CTC's delay in providing the required exemplars for the production – an extension CTC requested and Delille and the Navarra Gallery granted.

4810-4019-5085

69. The accuracy of the accusations, however, was never Defendants' concern. Rather, as Koutouzis' email to Levai makes clear, the goal was simply to find a pretext on which to clear the way for Defendants' CTC ceramics edition by voiding the Production Agreement and removing the Navarra-Commissioned Ceramics from the market.

70. This fact is further confirmed by the remedy demanded in the February 19, 2007 cease and desist letter. Rather than asking for an explanation or rebuttal of the charges, the cease and desist letter peremptorily demanded that the Production Agreement be terminated, that all further production, exhibition and sale of Navarra-Commissioned Ceramics cease, that the Navarra Gallery and Delille return to CTC all Navarra-Commissioned Ceramics produced in 2006 and 2007, including those currently exhibited or for sale but not already sold, and that the Navarra Gallery and Delille return to CTC all means used to produce the Navarra-Commissioned Ceramics.

71. On April 4, 2007, a lawsuit, ostensibly on behalf of CTC, but actually at the behest of Defendants, was commenced against the Navarra Gallery. That lawsuit recycled the same charges as the earlier cease and desist letter. By judgment rendered March 30, 2012, the court in France dismissed each and every one of those charges as baseless.

72. Plaintiffs responded to the cease and desist letter and the court case by refraining from any sales of Navarra-Commissioned Ceramics, and even postponed an exhibit and sale of ceramics they had planned at the Darga Gallery in Bali. However, dealers who had purchased Navarra-Commissioned Ceramics from Delille prior to Defendants' actions, and who were unaware of the actions Defendants were taking to remove those ceramics from the market, continued to resell those ceramics to the public during this period. On April 8, 2007, two Navarra-Commissioned Ceramics were sold for 2,800 Euros each at Massol in Deauville,

France.  On May 31, 2007, a Navarra-Commissioned Ceramic was sold for 4,000 Euros at

Christie's in Paris.  On December 12, 2007, Christie's sold three more Navarra-Commissioned

Ceramics, for 3,000, 3,200 and 3,200 Euros, respectively.  On April 27, 2008, two Navarra-

Commissioned Ceramics were sold for 3,500 Euros each at Cannes Encheres in Cannes, France.

73. Seeing that these sales were going forward without objection from CTC, and that

CTC was continuing to cash all royalty checks the Navarra Gallery sent him, Plaintiffs, still

assuming incorrectly that CTC was behind the cease and desist letter and the court case,

concluded that CTC soon would be withdrawing the claims.

74. Accordingly, they decided to revive the plans to exhibit and sell Navarra-

Commissioned Ceramics at the Darga Gallery in Bali.  In connection with that, Darga, in order to

determine the proper prices for the Navarra-Commissioned Ceramics, which had thus far not

been sold in Asia, sought to test the Asian market by arranging for 12 of the Navarra-

Commissioned Ceramics to be auctioned at a Christie's Hong Kong sale scheduled for May 25,

2008.

75. Defendants, however – who, at this point in time, were planning to unveil their own

CTC ceramics edition in Asia in their booth at an upcoming Asian Pacific Contemporary Art

Fair in Shanghai in September 2008 – would not let that happen.

76. Accordingly, on May 15, 2008, Bourdon sent a letter to Plaintiffs' attorney

demanding that, within 48 hours, Plaintiffs provide copies of all the *bons-à-tirer* and related

financial information for the Navarra-Commissioned Ceramics, and threatened unspecified

consequences if the information was not provided by the short deadline set.  No mention was

made in this letter that the request related to the imminent Christie's Hong Kong auction.

4810-4019-5085

77. Demonstrating the bad faith behind that demand, Defendants, despite the short deadline, did not even wait 48 hours. Rather, on May 16, a full 24 hours before the deadline set for Plaintiffs to provide the demanded information, and without any advance notice to Plaintiffs, Bourdon emailed Christie's Hong Kong demanding that the Navarra-Commissioned Ceramics be withdrawn from the upcoming auction on the ground that CTC "has never given written authorization to reproduce these ceramics" and that "Mr. Chu Teh-Chun has the greatest reservations about the authenticity of the ceramics at present in circulation which were produced by the Francis Delille factory and bear the mark of the Enrico Navarra Gallery."

78. Bourdon also contacted in-house counsel for Christie's Paris, repeated the same charges, and demanded that Christie's Paris prevail upon Christie's Hong Kong to withdraw the Navarra-Commissioned Ceramics.

79. The charges made in these communications were absolutely and knowingly false. Indeed, as Yvon would later testify under oath on November 4, 2009, the Navarra-Commissioned Ceramics, including those to be auctioned at Christie's Hong Kong, were authentic, all the required *bons-à-tirer* had been received, and the supposed "greatest reservations about the authenticity of the ceramics" was a pure fabrication – and, indeed, a fabrication that would not find its way into the legal proceedings ostensibly brought on CTC's behalf until nearly two years after the charge of inauthenticity was first made in the email to Christie's Hong Kong.

80. Moreover, in explicitly charging Plaintiffs with attempting to sell inauthentic ceramics, and publishing those charges to major auction houses both in Paris and Hong Kong, the above statements are defamatory. They directly and explicitly malign Plaintiffs' character and business honesty.

4810-4019-5085

81. Further demonstrating the malice motivating these charges, Plaintiffs, on May 23, 2008, before Christie's withdrew the ceramics from the auction, provided Bourdon, by certified messenger, all the information demanded in the May 15, 2008 letter.  Nevertheless, Bourdon never notified Christie's of this fact, and never even responded to Plaintiffs' proffer, leaving Christie's with no choice but to withdraw the ceramics from auction.

82. These false and defamatory charges caused Plaintiffs financial, reputational and emotional damage.

83. First, the exhibit and sale of ceramics with Darga in Bali was permanently cancelled.

84. Second, although the publication of the charges to Christie's Hong Kong and Christie's Paris was not enough to remove the Navarra-Commissioned Ceramics entirely from the market, it was sufficient to convert Plaintiffs' association with the ceramics from an asset to a liability.  For example, on June 26, 2008, a Navarra-Commissioned Ceramic (again, from Delille's collection) was sold for 4,000 Euros at Deburaux APONEM auction house in Paris. Demonstrating the damage done to Plaintiffs' reputation, however, this time the advertisement for the sale, for virtually the first time, omitted the fact that the ceramic came from the "Navarra edition."

85. Third, having been falsely accused of a scurrilous career-ending crime, Plaintiffs suffered substantial fear, embarrassment and emotional stress that all but ended their ability to continue operating their business.

86. As Plaintiffs would discover, however, Defendants' attacks would only get worse.

87. After Defendants unveiled their CTC ceramics edition at the Asian Pacific Contemporary Art Fair, articles about that ceramics edition began to appear in the art press,

4810-4019-5085

including in the September 8, 2008 issue of a magazine called Lettre de l'Academie des Beaux-Arts.

88. From this article, Plaintiffs learned for the first time certain details of Defendants' CTC ceramics edition.

89. Although the article would later be revealed to be inaccurate in a number of respects, the article did accurately indicate that the project was a "co-edition" made by Marlborough and Sèvres, that there were more than 50 identical vases in the edition, each supposedly with a unique décor, and that CTC's contribution to the décor of each vase in the edition was limited to no more than one or two hours per vase.

90. Based solely on the information disclosed in this article, Plaintiffs realized that Defendants' CTC ceramics edition violated the exclusivity provisions of the Production Agreement.

91. Accordingly, they immediately wrote to Bourdon demanding, as was their right under the Production Agreement, a copy of the contract governing CTC's work at Sèvres and all details of the production.

92. In response to these legitimate demands, Defendants struck back hard.

93. First, in order to conceal the full extent of Defendants' violations of the exclusivity provisions of the Production Agreement, including violations not clear from the publicly disclosed information about Marlborough's arrangement with Sèvres, Caméo, Defendants' agent, refused to disclose the terms of Sèvres' contract with Marlborough.

94. Second, instead of providing that contract, Bourdon submitted a written statement from Caméo claiming that the supposed "unique décor" on each of the vases in Defendants' CTC ceramics edition rendered each vase a "unique piece" and therefore not part of an edition.

24

4810-4019-5085

95. This was an *ad hoc* theory concocted solely for the benefit of Defendants.

96. Indeed, at virtually the same time Caméo made this assertion, Sèvres was engaged in a project with the artist Zao Wou-Ki that was identical to the CTC project – namely unique decorations painted on ceramics.  Yet, for the Zao Wou-Ki project, Sèvres ultimately insisted that the works be marketed as an edition, with each exemplar described as a "unique autographed piece" numbered by reference to the size of the edition – for example, "2/8," "3/8" and so on. Moreover, even in its subsequent public descriptions of Defendants' CTC ceramics edition, Sèvres described the works not as "unique pieces" but as comprising a "limited edition" of 48 exemplars.  Further, as Marlborough admitted in private communications, CTC produced only one "unique" work at Sèvres, and that was to be withheld from commerce entirely.

97. Third, although Defendants, in unveiling the edition, had announced publicly that each of the vases would be numbered on the base, therefore at least implying its status as part of an edition, and prohibiting any further editions from being made of Defendants' CTC ceramics edition, Defendants, in response to Plaintiffs' accurate charge that Defendants' CTC ceramics edition violated the Production Agreement, attempted to hide that fact by omitting the numbers from the finished vases.

98. Fourth, Defendants maliciously attacked the Navarra-Commissioned Ceramics and Plaintiffs personally in a half page advertisement titled "A Public Warning From Mr. Chu Teh-Chun," which was run in the October 3, 2008 edition of a magazine called Le Journal des Arts. That advertisement (the "Journal ad") stated in its entirety:

> "Mr. Chu Teh Chun, a French artist, has been led to bring legal proceedings against the Galerie Navarra, pending before the Superior Court of Paris.
>
> "One of the essential grounds for this legal initiative stems from the fact that various editions of Mr. Chu Teh Chun's ceramics have been

4810-4019-5085

produced, distributed, commercially marketed, and presented for sale, even though Mr. Chu Teh Chun did not sign for each a *bon-à-tirer*.

"Notwithstanding all of the rights reserved that he was brought to sign, with the assistance of his Attorney, Lawyer William Bourdon, an attorney of the Bar of Paris, certain ceramics were nonetheless presented for sale, in particular by CHRISTIE'S of Hong Kong, in the auction sale "Chinese 20th Century Art" on May 25, 2008.

"In response to a formal notice sent by his Attorney, CHRISTIE'S renounced the sale of these ceramics.

"Nevertheless, in the aim of safeguarding his rights and in the potential circumstance that others of his ceramics coming from the workshops of the Navarra gallery could be presented for sale, as these ceramics would not be authentic, because they would not have received a *bon-à-tirer*, Mr. Chu Teh Chun gives a warning, as well as a reminder, under these circumstances, that it belongs to each individual at his or her own responsibility to carry out all of the necessary verifications before purchasing such ceramics, marketing them, or presenting them for sale.

"He furthermore reserves the right to possibly file any legal action for the purpose of protecting his rights and to call for any and all damage and interest claims in reparation for harm that may be suffered."

99. The Journal ad, like the email to Christie's Hong Kong before it, was absolutely and knowingly false.

100.    First, the Journal ad was not a "warning from Mr. Chu Teh-Chun." Yvon, Defendants' agent, purchased the Journal ad. Indeed, upon information and belief, CTC was not consulted at all prior to the publication of the Journal ad.

101.    Second, it was not a "fact that various editions of Mr. Chu Teh Chun's ceramics have been produced, distributed, commercially marketed, and presented for sale, even though Mr. Chu Teh Chun did not sign for each a *bon-à-tirer*." CTC did sign a *bon-à-tirer* for each ceramic – a fact Yvon conceded later in the French court proceedings supposedly instituted on behalf of CTC, a fact the court appointed expert in that case confirmed, a fact Yvon later would

26

4810-4019-5085

testify to under oath, and a fact the court in the French court found in dismissing the claims supposedly brought on CTC's behalf.   Further, as noted extensively above, CTC was well-aware of and even participated in the exhibitions and sales about which the Journal ad pretended to complain.

102.    Third, it is also not true that "the ceramics would not be authentic, because they would not have received a *bon-à-tirer*" – or, as the Journal ad later states, "Mr. Chu Teh Chun gives a warning, to whomever it concerns, against the circulation of ceramics that are void of authenticity …"   As noted above, CTC himself was not giving the warning, and, in any event, he did sign a *bon-à-tirer* for each of the ceramics.  Moreover, as Yvon would later concede under oath, neither CTC nor he ever had any question that the ceramics – including specifically the ceramics that were to be auctioned at Christie's Hong Kong – were authentic.  The statements otherwise in the Christie's Hong Kong email and the Journal ad were a pure fabrication.

103.    The Journal ad, like the email to Christie's Hong Kong, also was highly defamatory.  It attacks Plaintiffs by name as purveyors of inauthentic artwork.  Such a charge is one of the most harmful and damaging statements that could be made about an art dealer.  It goes right to the heart of Plaintiffs' professional reputation and directly impugns their morality and professional honesty.

104.    In addition to being knowingly false, the Journal ad was also motivated by pure malice.

105.    First, the ad does not so much as mention the name of Delille, who actually produced the Navarra-Commissioned Ceramics with CTC, was responsible for obtaining the requisite *bons-à-tirer* and, unlike Plaintiffs, had sold his collection of Navarra-Commissioned Ceramics.  Instead, Defendants only attack Plaintiffs – even going as far as referring falsely to

27

non-existent "workshops of the Navarra gallery," rather than Delille's foundry, in an effort to focus the harm of the charges solely on Plaintiffs personally.

106.   Second, the Journal ad cites the fact that Navarra-Commissioned Ceramics were almost auctioned by Christie's Hong Kong, and would have been had Bourdon not interceded, as the ostensible reason for CTC's supposed warning.  But the Journal ad was purchased a full four months after that supposed "emergency" had been averted, during which time customers of Delille, with no objection from CTC, had continued to sell their collections of Navarra-Commissioned Ceramics at public auctions.  The real "emergency" was that Plaintiffs' questions regarding Defendants' CTC ceramics edition threatened to prevent that edition from coming to market.  Indeed, the Journal ad was purchased precisely during the period Bourdon and Defendants were formulating the strategy for responding to Plaintiffs' accusations that Defendants' CTC ceramics project violated the Production Agreement.

107.   The choice of the Journal as the publisher of this advertisement was not accidental.  The Journal is widely-read and influential within the small, specialized and global market for high-end art, including CTC's art.  Indeed, by placing the advertisement in the Journal, Defendants deliberately chose a publication targeted and circulated to the very people around the world who make up the market for CTC's art generally, and CTC's ceramic work in particular.

108.   And if that were not enough to ensure that the "warning" fully penetrated the market, Defendants saw to it that the charges were republished in various media outlets around the world.  For example, on September 29, 2008, three days after the Journal ad was purchased and four days before it was published, Koutouzis wrote Levai that he needed money to give "gifts" to journalists in Asia.  One month later, the accusations in the Journal ad started to appear

4810-4019-5085

in articles in the Asian press, ultimately appearing on 50 Chinese language websites. Those charges are still being circulated today.

109.    The false charges of the Journal ad quickly spread throughout the market and had their desired and predictable effect – definitively rendering the Navarra-Commissioned Ceramics unsalable, and everyone associated with them, but especially Plaintiffs, commercially tainted.

110.    On November 4, 2008, one of the dealers who purchased Navarra-Commissioned Ceramics from Delille, Galerie Raymond Dreyfus, wrote to CTC, with copies to Delille and Plaintiffs. Citing the Journal ad, Dreyfus demanded that CTC confirm on the back of photographs of the ceramics he purchased that those ceramics are not authentic and had not received the required *bons-à-tirer* "so that [he] can demand reimbursement from the publisher..."

111.    On December 2, 2008, Philippe Lucchini, another dealer who purchased Navarra-Commissioned Ceramics from Delille, wrote to CTC about the Journal ad, stated that he purchased a series of the ceramics in 2004, has recently been advised of CTC's statements in the Journal ad, is astonished that CTC would place such an ad four years after Lucchini purchased the ceramics, and demanded clarification of the Journal ad's accusations.

112.    On December 3, 2008, Galerie Raymond Dreyfus wrote CTC again, apparently in response to a letter sent him in response to his earlier letter. His December 3 letter noted that "you did not respond to the simple question that I asked: are the ceramics real or false, authentic or not?"

113.    On January 6, 2009, another dealer who purchased Navarra-Commissioned Ceramics from Delille, Michael Carlsson, wrote Delille in response to the Journal ad. He stated: "I was very surprised to hear that CTC is contesting the ceramic plates I have bought through you, by an article in the Journal des Arts of last October 2008 ... you must understand that it will

4810-4019-5085

be difficult or rather impossible for me to sell these ceramics in this condition.  I would appreciate if you could consider cancelling my order of the set of 9 vases and taking back the works delivered to me and paid previously."

114.    On January 28, 2009, Galerie Raymond Dreyfus wrote CTC yet again to reiterate that the Journal ad is damaging his business as well as the business of other dealers who bought the ceramics: "You cannot be unaware that a communication like the Journal ad circulating in the art market, notably in Taiwan and China, markets that are new and fragile, and the confusion that reigns dissuades a number of merchants and buyers from buying your work."

115.    On February 17, 2009, Amoui Goldenberg, of Artco France (another of Delille's purchasers), wrote to CTC demanding clarification of the accusations in the Journal ad.  She wrote that she learned that CTC is contesting the authenticity of the Navarra-Commissioned Ceramics from Christie's Hong Kong, the Journal ad and other auctioneers, and noted that she was particularly surprised since Delille had introduced her to CTC during an opening at Trigano on December 12, 2006, and at that time Delille told CTC about her purchase of Navarra-Commissioned Ceramics.  On the same day, her husband, Serge Goldenberg, wrote to Delille cancelling further ceramics orders unless the CTC controversy is resolved.

116.    As Defendants intended, however, the damage to Plaintiffs was much more extensive.

117.    To begin with, Plaintiffs' entire inventory of Navarra-Commissioned Ceramics, like those held by the dealers quoted above, was rendered unsalable and the Navarra Gallery's investment in them totally lost.

118.    But Plaintiffs, unlike the other dealers quoted above, were also named personally in the Journal ad as purveyors of fakes.  The damage to an art dealer from such a false

4810-4019-5085

accusation, published and circulated all over the world and to virtually every participant in the market, is devastating.  Indeed, providing stark proof of that fact, on January 8, 2009, the president of Comité Professionnel Des Galeries D'Art, the prestigious trade association for French art dealers, membership in which is virtually essential in order to operate a successful art dealing business in France, wrote to Plaintiffs that he "has taken notice of the [Journal ad] and [CTC's] accusations about counterfeiting.  We ask you to keep us informed of the evolution of this affair.  Given the publicity that has been made of the affair already, we may be forced to suspend you from the organization."

119.    As a direct result of these false accusations, therefore, Plaintiffs' years of work and millions of dollars of investments in building their reputations and dealing presence in Asia, France, the United States and around the world, were destroyed, Plaintiffs' business was completely paralyzed, Mr. Navarra personally suffered debilitating emotional stress and embarrassment, and Plaintiffs were thereafter forced to devote nearly all their time and financial resources to defending against the false charges made against them.

120.    On December 5, 2008, and December 23, 2008, respectively, Plaintiffs, having at this point no idea that Defendants were actually the primary actors behind the harm done to them, commenced suits against the Journal des Arts for libel, and against CTC for unfair competition.

121.    The action against Journal des Arts was ultimately settled, at the Journal's request, after Yvon's November 4, 2009 sworn testimony, and other evidence, confirmed that the statements in the ad were absolutely false and defamatory.

122.    The case against CTC for unfair competition was preliminarily dismissed for reasons irrelevant to this action – a decision, in any event, that shortly will be appealed.

4810-4019-5085

123.    Even after the foregoing acts and damage, Defendants have continued and even increased their efforts to ensure that the Navarra-Commissioned Ceramics remain unsalable, that Defendants reap the full improper benefits of their wrongful conduct, and that Plaintiffs continue to suffer the near total damage to their businesses and reputations.

124.    They have been aided in such efforts by a tragic event: CTC's stroke on January 25, 2009, which, upon information and belief, has left him in all but a vegetative state.

125.    Within one week of that event, Koutouzis and Yvon were in Asia on behalf of Marlborough attempting to organize shows of Defendants' CTC ceramics edition in Hong Kong and Macau.  Desroches would later be listed along with Koutouzis and Yvon as an organizer of these shows.

126.    Moreover, having successfully eliminated the Navarra-Commissioned Ceramics from the market, and with CTC guaranteed not to produce additional artwork of any kind, Defendants, now holding virtually the entire stock of marketable CTC ceramics and the attendant power to control prices, almost immediately, and before they had sold a single vase, increased the asking price for their ceramics by 550% relative to what they had hoped to sell them for before CTC's stroke and the wrongdoing alleged herein.  Indeed, Koutouzis, in attempting to market Defendants' ceramics edition at an exhibition in Hong Kong in May of 2010, cited CTC's stroke, and the resulting guaranteed absence of virtually any other CTC ceramics work, as a justification for the high price Defendants are asking for their vases.

127.    Further, CTC's stroke permitted Defendants to formalize their arrogation of control over every aspect of CTC's business and artistic output, including the right to control the market for CTC's art work in all media through a plenary right to declare what is and is not an authentic work of art by CTC.

128.    As noted above, Atelier CTC, which is controlled by Yvon, Desroches, Koutouzis and CTC's wife, began acting in CTC's name as early as November 2007 – more than a year before CTC's stroke.  After his stroke, Atelier CTC registered officially in France on April 18, 2009 and announced as its mission: "to defend and promote the work of [CTC], to understand and respect his wishes regarding his work, act if necessary for the authentication of the works of [CTC] and in particular by judicial action against all attacks that are likely to come against his work, for example the production and diffusion of fakes…"

129.    In other words, following CTC's stroke, Defendants almost immediately seized for themselves the right to declare, ostensibly on behalf of CTC, that other dealers' CTC work, including the Navarra-Commissioned Ceramics, are fake.

130.    And if there is any question that Defendants plan to misuse this power to further harm competitors such as Plaintiffs, Koutouzis, in a recent catalogue for a show of Defendants' CTC ceramics edition in Macau, contributed an essay announcing that:

> We would like, on the occasion of this exhibition, to announce the preparation of the catalogue raisonné of the work of Chu Teh-Chun (b. 1920).  Its preparation in various categories: paintings, watercolors & gouaches, inks and calligraphies is being undertaken by an association comprised of The Studio of Chu Teh-Chun known in France as l'Atelier Chu Teh-Chun (ATC) and a scientific committee composed of art scholars and connoisseurs.  A schedule of meetings (approximately 4 times a year) will allow the committee to examine the works and determine their inclusion in the catalogue raisonné.

131.    Further, Defendants, again working with Desroches, have already misused a similar improperly-obtained control over the estate of the artist T'Ang Haywen to eliminate competitors in the sale of works by that artist.

4810-4019-5085

132.    Finally, without CTC able to contradict them, Defendants and their agents have continued their attacks on the Navarra-Commissioned Ceramics – this time explicitly in the context of attempts to sell their own ceramics edition.

133.    Defendants began to market their CTC ceramics edition commercially in June 2009, first with a show at Musée Guimet.

134.    Although nominally a state-owned and operated museum charged with preserving French cultural heritage, Defendants, with the help of their agent Desroches (Musée Guimet's Curator in Chief), were improperly given the use of this state-owned facility to further their purely commercial ends.

135.    It was not just Desroches who misused his position at Musée Guimet for Defendants' commercial ends. Koutouzis himself was and remains a *chargé de mission* at the museum – a status Marlborough demanded he maintain.

136.    Moreover, in order to hide from the French government and the public the impropriety of Defendants' use of Musée Guimet's facilities and prestige for this purpose, Desroches and Koutouzis, in the exhibit contract with the museum, omitted Marlborough's involvement entirely, arranging instead for it to be signed by Yvon on behalf of (i) his family, which the contract falsely describes as the "owners of the exhibited pieces" (in fact, Marlborough owns the overwhelming majority of the pieces) and (ii) an unnamed "gallery" (Marlborough) with which, the contract falsely claims, the pieces are merely "on deposit."

137.    There is no question that the exhibit was a purely commercial enterprise on Marlborough's part. Marlborough created the guest list for the opening. Levai insisted that his business card be attached to every invitation. And the Marlborough sales team began to market the vases to potential customers during the exhibit.

4810-4019-5085

138.    The next step in Defendants' marketing effort was the publication of a catalogue of its CTC ceramics edition (the "Marlborough Catalogue").  Although ostensibly a "catalogue raisonné" written by Desroches and published by the prestigious French publisher, La Martinière, the Marlborough Catalogue was nothing more than an expensive sales brochure for Defendants' CTC ceramics edition.  Marlborough paid the entire cost of publishing the Marlborough Catalogue; Marlborough found and paid each of the contributors to the Marlborough Catalogue; Marlborough owns the copyright to the Marlborough Catalogue, jointly with Atelier CTC;  Marlborough provided all the text for the Marlborough Catalogue; Marlborough reviewed and approved all the text of the Marlborough Catalogue before providing it to La Martinière; Marlborough approved the layout of the Marlborough Catalogue; Defendants wrote the preface and acknowledgements sections of the Marlborough Catalogue; and Marlborough provided La Martinière a guaranty against liability in connection with the publication and distribution of the Marlborough Catalogue.

139.    Indeed, confirming that the Marlborough Catalogue was nothing more than a sales brochure for Defendants' CTC ceramics edition, Koutouzis, in a September 23, 2008 email to Levai, argued that the Marlborough Catalogue is in "Marlborough's long term financial interest" precisely because it is the "most effective promotional tool" for Defendants' CTC ceramics edition and because the cost is low relative to the marketing benefit of being able to use La Martinière's prestige to sell Defendants' CTC ceramics.

140.    Marlborough used this promotional tool to further harm Plaintiffs and their ability to market the Navarra-Commissioned Ceramics in the following ways.

141.    First, picking up where the Journal ad left off, the Marlborough Catalogue states:

> Over a thousand canvases predated Chu Teh-Chun's rendezvous
> with the Sèvres porcelain manufactory, as did an even greater

number of ink drawings and watercolors. Nevertheless, in that time he has conducted only a few **experiments** with ceramics, notably in a workshop outside of Taipei in 1998 and in another in Treigny, France, in 2002. But **these modest explorations were not pursued** . . .

142.    Consistent with Defendants' prior efforts to remove the Navarra-Commissioned Ceramics from the market, this statement asserts as fact that all CTC ceramics work predating Defendants' CTC ceramics edition, including the Navarra-Commissioned Ceramics, which constitute virtually the entirety of CTC's ceramics output prior to Defendants' CTC ceramics edition, are mere "experiments" that were "not pursued" – a statement that denies, and is understood among participants in the high-end art market to deny, the Navarra-Commissioned Ceramics' authenticity as completed, authorized works of art by CTC.

143.    Indeed, describing the Navarra-Commissioned Ceramics as mere "experiments" that were "not pursued" is simply another way of charging again – and, particularly on the heels of the Journal ad, is understood by participants in the high-end art market as charging again – that CTC never provided the requisite *bons-à-tirer* on the Navarra-Commissioned Ceramics. This is because an artist's provision of *bons-à-tirer* on any artwork produced in editions is recognized among participants in the high-end art market as precisely the dividing point separating unsalable "experiments" that "were not pursued" from completed, artist-authorized works.

144.    That this is the case, and that this was Defendants' deliberate intention in describing all CTC's prior ceramics work as "experiments" that were "not pursued," is confirmed by the following.

4810-4019-5085

145.    First, Defendants' own prior claims regarding the inauthenticity of the Navarra-Commissioned Ceramics were based solely on the false charge that CTC had not signed the requisite *bons-à-tirer*.

146.    Second, the Marlborough Catalogue states that, in beginning his work on Defendants' CTC ceramic edition, a challenge for CTC was: "How could he assert his identity as a painter within his *new* identity as a ceramicist?" (emphasis added).  Such a statement once again states as a fact that CTC had not produced prior completed, artist-authorized ceramics work – indeed, how could he have if, prior to his work on Defendants' CTC ceramics edition, he had no identity as a ceramicist whatsoever?

147.    Third, the Marlborough Catalogue itself repeatedly emphasizes a distinction between mere "experiments" that were "not pursued," on the one hand, and complete, genuine, artist-authorized works of art on the other.  For example, the Marlborough Catalogue devotes page after page to descriptions of the many "experiments," "trials," and "tests" that CTC, who pays "keen attention to perfection," supposedly conducted and then did not pursue before the "testing period" was brought to a close and CTC finally "began" his work on Defendants' CTC ceramics edition.

148.    Fourth, to further ensure that the audience for the Marlborough Catalogue fully appreciated the import of the charge it makes regarding the Navarra-Commissioned Ceramics, the Marlborough Catalogue even falsely provides a reason CTC would not have pursued to completion his "experiments" on the Navarra-Commissioned Ceramics, claiming that CTC's first "experiments" in connection with Defendants' CTC ceramics edition involved plates, just like the Navarra-Commissioned Ceramics, but that CTC abandoned, and did not pursue such

4810-4019-5085

"experiments" because "[t]hese dishes, as it turned out, did not incarnate sufficiently noble forms."

149.    The facts also demonstrate that such attacks are highly material and damaging. As shown above, Defendants' false accusations regarding a lack of *bons-à-tirer*, by themselves, were sufficient to cause Christie's Hong Kong to cancel the auction of the Navarra-Commissioned Ceramics, cause the Comité Professionnel Galeries d'Arts to threaten to revoke Plaintiffs' membership, cause buyers of Navarra-Commissioned Ceramics to demand their money back and cancel further orders, and render the Navarra-Commissioned Ceramics entirely unsalable. Falsely denying the provision of *bons-à-tirer* through other language in a prestigious book that is supposedly a "catalogue raisonné" of CTC's ceramics work makes that damage permanent and virtually irreparable.

150.    Further, the facts also show that this was not a simple oversight on Defendants' part, as though the Marlborough Catalogue simply forgot to note that CTC "pursued" to completion at least 1,152 other ceramics – let alone that CTC in fact exhibited those ceramics to the public. As the email from Koutouzis to Levai on February 22, 2007 demonstrates, Defendants were intimately familiar with the details of the Navarra-Commissioned Ceramics. Moreover, Desroches, the ostensible author of the Marlborough Catalogue, was as well. Indeed, he had been hired by Vital at CTC's request to write a book on CTC's entire ceramics oeuvre, including the Navarra-Commissioned Ceramics – a project Desroches, working with Defendants, then convinced CTC's family to abandon in order to aid in Defendants' wrongful plot.

151.    Indeed, further demonstrating Defendants' recognition of the materiality of these charges and intent in making them, Defendants took actions to amplify them. For example, when Defendants, in advance of the final publication of the Marlborough Catalogue, placed a

4810-4019-5085

press release on La Martinière's website announcing its forthcoming publication of the Marlborough Catalogue, the "experiments" charge was one of only three paragraphs of the press release.

152.     Finally, the facts demonstrate the absolute malice and deliberate intent to deceive behind these statements in the Marlborough Catalogue.

153.     When Plaintiffs saw the above-noted press release on La Martinière's website, they immediately contacted La Martinière, demanded that it be removed or corrected and forwarded evidence conclusively establishing the falsity of the statement – including, *inter alia*, the report of the court-appointed expert in the French case ostensibly brought on behalf of CTC, in which she confirmed "without hesitation" that CTC had in fact provided all the requisite *bons-à-tirer* and, accordingly, that the Navarra-Commissioned Ceramics were in fact authorized works of art by CTC.

154.     La Martinière removed the press release immediately.  It also stated, in its letter response, received by Plaintiffs on October 5, 2009, that Marlborough had provided all the text for the Marlborough Catalogue, that Marlborough had indemnified La Martinière against liability for publishing the catalogue, and also confirmed that it had forwarded to Marlborough the evidence Plaintiffs provided.  It was only from this letter, and the subsequent publication of the Marlborough Catalogue, that Plaintiffs received the first hint that Marlborough was behind the wrongdoing alleged herein.

155.     Yet, unlike La Martinière, and despite receiving the evidence La Martinière provided, Defendants responded not by removing the offending text from the final publication of the Marlborough Catalogue but by sharpening its damaging charges.  Specifically, while the

4810-4019-5085

press release only used the term "experiments" to describe CTC's prior work in ceramics, the Marlborough Catalogue itself added that those experiments were "not pursued."

156.     The libel that the Navarra-Commissioned Ceramics were merely "experiments" that were "not pursued" is not the only false assertion of fact in the Marlborough Catalogue.  In addition to the foregoing, the Marlborough Catalogue also repeatedly asserts that CTC's personal involvement in the production of Defendants' CTC ceramics edition resulted in unique non-manufactured works of art different in kind from, far superior in artistic quality to, and far more valuable than any other CTC ceramics, including the Navarra-Commissioned Ceramics.

157.     Specifically, the Marlborough Catalogue asserts, on the one hand, that CTC's prior work in ceramics at best involved only a "few experiments" and "modest explorations" that "were not pursued." And, indeed, of these supposedly "not pursued" "experiments," only two, in 1998 and 2002 (and therefore not the 2003 and 2004 experiments that led to the production of the Navarra-Commissioned Ceramics), are even "notable."

158.     On the other hand, according to the Marlborough Catalogue: (i) CTC's contribution to Defendants' ceramics edition took him "two years"; (ii) CTC alone "meticulously" applied all the decoration to the vases in the edition, with other artisans at Sevrès only participating in the "firing" process and in mixing paints; and (iii) CTC's contribution to each vase in the edition required "300 hours of work, on average."

159.     These claims, in varying forms, appear repeatedly throughout the Marlborough Catalogue.  For example:

> They [the vases in Defendants' CTC ceramics edition] were decorated at Sevrès in 2007 and 2008 by Chu Teh-Chun, using metallic oxides blended with various fluxes.  The overglaze painting of each piece required 300 hours of work, on average.

4810-4019-5085

160.    None of these statements, whether about Defendants' CTC ceramics edition or CTC's prior ceramics work, is true.

161.    Far from a "few experiments" and "modest explorations" that were "not pursued," the Navarra-Commissioned Ceramics took two years of tests, trials, experiments, and over 200,000 Euros to produce, including 111 meetings between CTC and Delille, and over 100 hours of CTC's personal involvement in the process.

162.    Moreover, Defendants' CTC ceramics edition, which cost less to produce than the Navarra-Commissioned Ceramics, involved no more than 13 sessions and no more than two hours of CTC's time per vase.  Indeed, if it is true, as the Marlborough Catalogue asserts, that "the overglaze painting of each piece required 300 hours of work, on average," then CTC himself provided only a miniscule contribution to the decoration of the vases.

163.    These false statements about the time, cost, workmanship, and personal involvement of the artist in each project are highly material to the market's purchasing and pricing decisions.

164.    Indeed, the fact that Defendants so deliberately distort the truth in this regard, and repeat those distortions a number of times throughout the Marlborough Catalogue, demonstrates Defendants' recognition of the materiality of such assertions to the market's purchasing and pricing decisions.

165.    Moreover, the Marlborough Catalogue's false descriptions of such matters are highly damaging.  They operate to inflate artificially the perceived value of Defendants' CTC ceramics edition directly at the expense of the perceived value of the Navarra-Commissioned Ceramics, which, in comparison, are deemed inferior and less collectable.

4810-4019-5085

166.    Finally, this false comparison was made with malice.  Defendants knew the true facts about the amount of work CTC actually performed in creating their CTC ceramics edition. Indeed, they paid Desroches to shadow CTC the entire 160 hours CTC worked on the project. Moreover, before CTC's stroke, no claim was ever made by Defendants or their agents that CTC devoted any more than two hours to each vase.  Yet, knowing the truth, Defendants deliberately made false statements.

167.    Having made these false and defamatory statements in the Marlborough Catalogue, Defendants then ensured that they were distributed widely within the relevant market. For example, Koutouzis has stated under oath that the Marlborough Catalogue was distributed widely in Europe, Asia and the United States. Defendants have also distributed it and otherwise made it available in the context of attempting to interest specific buyers in purchasing the vases.

168.    The Marlborough Catalogue, however, would not be the end of Defendants' damaging claims.

169.    Following the Musée Guimet show and the publication of the Marlborough Catalogue, Defendants have repeated many of the offending statements in the Marlborough Catalogue, and added others, in their continuing attempt to enhance the perceived value of their ceramics edition at the expense of the Navarra-Commissioned Ceramics.

170.    And showing the malice behind those efforts, these actions have continued despite the fact that Plaintiffs have many times notified them of the damages such statements are causing and demanded that such statements be corrected.

171.    For example, in subsequent exhibitions of Defendants' CTC ceramics edition in Asia, at the National Art Museum of China ("NAMOC") in March 2010 and at the University of Hong Kong in May 2010, both exhibitions organized by Defendants for sole purpose of selling

4810-4019-5085

their CTC ceramics edition, Defendants, who by this point in time were advertising that the price

of their CTC ceramics was many multiples of the 5,000 Euros for which the Navarra-

Commissioned Ceramics had been selling before Defendants' attacks, represented to the buying

public that over half of their ceramics edition was now in private collections, including six vases

supposedly in private collections in Hong Kong.

172.    This is a knowingly false statement of fact designed to convey the impression in

the market that there is demand for Defendants' ceramics at the exorbitant prices Defendants

claim to be charging, when, in fact, there is not.  Indeed, at the time these statements were made,

only three vases had been sold to a single buyer, on November 19, 2009 (that is, well after most

of the wrongdoing alleged herein), and for far less than the advertised retail price.

173.    Such false statements further damage the Navarra-Commissioned Ceramics.  As

noted above, before Defendants' wrongdoing, and before CTC's stroke ensured that the supply

of CTC ceramics work would never increase, the highest price obtained for a Navarra-

Commissioned Ceramics was 5,000 Euros.  By falsely stating that Defendants' CTC ceramics

are selling successfully at many multiples of that amount, Defendants are, once again, stating

falsely, by necessary implication, that the Navarra-Commissioned Ceramics are far inferior to,

and viewed by the market as far less valuable than, Defendants' CTC ceramics edition.

174.    Second, in the catalogue for the NAMOC exhibit, Defendants repeat the false

charge that CTC's prior works in ceramics were "modest explorations" that were "not pursued."

175.    Third, in the text of the catalogue Defendants provided for the University of Hong

Kong exhibit, Defendants, although they finally abandoned the "experiments" and "not pursued"

libels, make the false claim that each of the vases in their CTC ceramics edition is "is a unique

porcelain jar."  They also repeat versions of that claim in other statements made in the context of

4810-4019-5085

marketing their CTC ceramics edition – for example, in a press release announcing the Musée Guimet show ("each is a unique jar"), in the catalogue for a show of the vases in Suzhou, China in December 2009 ("[e]ach of the ceramics of this series is a unique work of art"), in the catalogue for a July 3 to August 29, 2010 show of Defendants' CTC ceramics at the Macau Art Museum in Macau, China ("[e]very piece is a unique masterpiece of art…"), and even print it on the base of each vase ("pièce unique").

176.    Those purported statements of fact are simply false.  Defendants' CTC ceramics comprise an edition of identical jars.  The only difference among them is that each has a unique décor to which CTC made a small contribution.  In the high-end ceramics market, and even under Sèvres' own rules, that slight difference among them does not permit a vendor to describe them as "unique jars," "unique works of art," "unique masterpieces," or "pièce unique" unless they are at the same time clearly numbered as part of an edition, which Defendants' CTC ceramics are not.  Indeed, as noted above, Defendants, in private communications, have admitted that CTC in fact produced only one "unique" piece at Sèvres, which is required to be withheld from commerce.

177.    This difference between an edition – even where each piece in the edition has a unique décor – and a truly unique work of art is highly material.  Indeed, it is critical to participants in the high-end market for ceramics.  A truly unique one-of-a-kind work entirely fabricated by an artist is highly prized and appropriately valued at multiples of the prices for works produced in editions.

178.    On the other hand, from the market's perspective, a far smaller distinction is made between an edition produced in multiples and an edition where the artist contributed to a unique décor on each piece in the edition.  Indeed, although the market might perceive a distinction

4810-4019-5085

between the two types of editions and place a higher value on the latter than the former (in both cases tied to the extent of the artist's contribution to the décor), the more material fact, from the market's perspective, is what is similar between the two – namely that both are foundry-manufactured, rather than artist-produced, products.

179.    These misrepresentations are also highly damaging to the Navarra-Commissioned Ceramics.  To the extent there are truly unique one-of-a-kind works by CTC on the market, that necessarily depresses the value of the works produced only in editions, such as the Navarra-Commissioned Ceramics, which, in comparison, are deemed inferior and less collectable. Accordingly, once again, Defendants' false statements regarding its own CTC ceramics edition operate to inflate artificially the perceived value of those ceramics directly at the expense of the Navarra-Commissioned Ceramics.

180.    Fourth, in the catalogue for a July 3 to August 29, 2010 show of Defendants' CTC ceramics at the Macau Art Museum in Macau, China, Defendants repeat again the false claim that CTC personally spent 300 hours on each of the vases in Defendants' CTC ceramics edition. Specifically, the catalogue states:

> So as to impose his own identity as a painter onto this demanding
> material, Chu plunged to the very depths of his being and
> concentrated in total silence in order to transcribe his highly
> sensitive inner language.  This difficult exercise of free
> improvisation took two years and Chu spent a total of over 300
> hours of patient labour on each piece.

181.    This claim is false, material and highly damaging for all the reasons already noted above.

182.    Finally, even in the context of this litigation, Defendants have continued to falsely and maliciously denigrate the Navarra-Commissioned Ceramics by repeatedly describing them as "replicas."

183.   As Defendants know, that description is false.  First, in internal communications, Defendants never refer to the Navarra-Commissioned Ceramics as "replicas."  Instead, they accurately note that the Navarra-Commissioned Ceramics are CTC ceramics published in "editions" – that is, no different from other works of art published in editions, such as prints or photographs, where the "works of art" are the pieces in the edition, not the base model from which the edition is made.  Second, Marlborough has staged a show, both in its New York gallery and its Monaco gallery, of a ceramics edition by the artist Zao Wou-Ki, which was produced using the exact same process Delille and CTC used to create the Navarra-Commissioned Ceramics.  In marketing the Zao Wou-Ki edition to the public, however, Marlborough, in the catalogue for the exhibition, did not describe the edition as "replicas," but rather as "enamel on porcelain, edition of 8."  Moreover, the prices Marlborough charged for these works in 2008 was as high as 33,000 Euros.  In other words, when it comes to marketing its own identical ceramics project, Defendants emphasize the artist's hand on the work and charge multiples of what Defendants now imply the Navarra-Commissioned Ceramics are worth; but when it comes to describing the Navarra-Commissioned Ceramics, Defendants claim they are mere replicas.  This is yet another bad faith effort to tarnish the reputation of a competitor and ensure that the Navarra-Commissioned Ceramics remain eliminated as competition for the sale of Defendants' CTC ceramics edition.

## FIRST CAUSE OF ACTION
### (Common Law Tortious Interference with Contract)

184.   Plaintiffs repeat the allegations above as fully set forth herein.

185.   As detailed above, the Navarra Gallery and CTC were parties to the Production Agreement.

186.   Defendants were aware of this contract.

4810-4019-5085

187.    As detailed above, Defendants intentionally interfered with the Production

Agreement, and Plaintiffs' rights and expectations thereunder, by violating its restrictions on the

production of competing editions, by acting to void the Production Agreement through a

frivolous lawsuit ostensibly brought on behalf of CTC, and by repeatedly taking actions and

making and disseminating false statements that were designed to and did deprive Plaintiffs of

their rights and expectations under the Production Agreement.

188.    Defendants' actions were dishonest, unfair, improper, malicious, wrongful,

without justification, defamatory, libelous, and taken for the purpose of harming Plaintiffs and

depriving them of their rights and expectations under the Production Agreement.

189.    By these actions, Defendants have caused a breach of the Production Agreement,

and caused Plaintiffs substantial damage, including but not limited to the loss of investment in

the Navarra-Commissioned Ceramics (approximately 400,000 Euros) and the lost profits from

the sale of Navarra-Commissioned Ceramics (currently calculated to be $15,360,000 at a profit

of $16,000 per plate).

190.    Further, as a result of Defendants' actions, they have reaped profits appropriately

disgorged to Plaintiffs, including any revenues from the sale of Defendants' CTC edition.

191.    The foregoing conduct of Defendants constitutes tortious interference with

contract under the common law of the State of New York.

### SECOND CAUSE OF ACTION
#### (Aiding and Abetting)

192.    Plaintiffs repeat the allegations above as if fully set forth herein.

193.    As detailed above, all of the wrongful actions complained of herein were taken by

Defendants or by Defendants' agents on Defendants' behalf and for Defendants' benefit.  In the

alternative, the allegations demonstrate that Defendants knowingly participated in and

4810-4019-5085

substantially assisted Bourdon, Desroches and Yvon in taking their respective actions, and that

Defendants' assistance and encouragement was a substantial factor in causing the relevant

actions and the damage to Plaintiffs that flowed therefrom.

194.   The foregoing constitutes aiding and abetting tortious interference with contract.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury as to

all issues so triable in this action.

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants as follows:

1.   Directing that Defendants cease distributing any copies of the Marlborough Catalogue

and the catalogues for the NAMOC, University of Hong Kong, Macau and Suzhou exhibits,

cease making the false statements complained of herein, and engage in corrective advertising

appropriate to remedy the injuries caused by their actions;

2.   Awarding Plaintiffs their damages and Defendants' profits derived by reason of the

unlawful acts complained of herein as provided by law and in an amount to be determined at trial;

3.   Awarding Plaintiffs exemplary damages as provided by law and in an amount to be

determined at trial;

4.   Awarding Plaintiffs prejudgment interest and costs of this action as provided by law;

and

5.   Such other and further relief as is just and proper.

4810-4019-5085

Dated: New York, New York
      April 18, 2012

FOLEY & LARDNER LLP

By: _____

Jeremy Wallison (jwallison@foley.com)
Adam C. Losey (alosey@foley.com)
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229

Ariel Fox Johnson (afox@foley.com)
3000 K St. NW
Ste. 600
Washington, DC 20007
Telephone: (202) 295-4664
Facsimile: (202) 672-5399

*Attorneys for Plaintiffs*

4810-4019-5085